Good afternoon, your honors. My name is Jerome Moschetta. I'm a Deputy District Attorney in Washington County, Pennsylvania. I represent the appellants in this case. I'd like to be granted. Thank you, your honor. Your honors, as you know, this is the government's appeal of a district court order granting federal habeas relief to Mr. Vickers under the Anti-Terrorism and Effective Death Penalty Act, section 2254 D1. Mr. Vickers is a prisoner in Pennsylvania serving a sentence for aggravated assault. And as you know, the appeal in this case centers around one key issue. Mr. Vickers went to trial, a non-jury trial, in Washington County where he was eventually convicted. Unfortunately, prior to his trial, Mr. Vickers did not sign a waiver of his right to a jury trial and he was not given a colloquy by the trial court concerning his waiver of that right. Because of these deficiencies procedurally, the district court granted Mr. Vickers a new trial. I'd like to discuss two issues that I think are pertinent to this appeal. And the first is what our contention is that the district court misapplied the deferential standard of review that applies under AEDPA in reviewing what the state court did. And the second issue is prejudice. And what comes with that is an argument that the appellants have waived any argument with regard to prejudice. So on the question whether the district court erred in not according AEDPA deference, can you address Lafler as to this case? Because didn't the Supreme Court in Lafler already speak to exactly this question? That is, where the state court has addressed a claim of ineffective assistance discussing only whether a waiver is knowing involuntary. That is, per se, contrary to or an unreasonable application of Strickland under Lafler. Why doesn't that dispose pretty quickly of the first issue that you say you want to address today? Well, Your Honor, I think because the findings of fact in this case, I think, work in the district court, which very clearly, I think, set out that this is not a case where the trial court deprived Mr. Vickers of a jury trial that he expressly asked for. But you're going into merits that may relate to performance or prejudice. But we have a threshold question. Are we according AEDPA deference? Or should the federal court be argue as your first issue that the district court erred in not applying AEDPA deference? Doesn't Lafler say there is no AEDPA deference in this situation? I'll be honest with you, Your Honor, I don't know the answer to that question. The district court... Well, let me ask this another way. And I'm not sure whether Lafler says that clearly or not, but I do know what 2254 says. Okay? And section 2254D says that, in essence, that the deference only applies to questions adjudicated on the merits in state courts. And my reading of what transpired here, from the opinion of the Superior Court, was that they never got to the question of deference. They decided there could be a question before them on the question of deficient performance. Well, the Superior Court did credit all of the factual findings of the PCRA court, saying that they found that Mr. Vickers did, in fact, waive his right to a jury trial, though there was no express waiver on that matter. Correct. But I don't think the state courts ever got to the question of prejudice, because their review all went to the question of whether or not Vickers knowingly and intelligently, voluntarily, waived his right to a jury trial. That's right. And they also looked that there was a reason why Vickers' counsel chose to go non-jury, because this was a case of aggravated assault, and it was perhaps an easier question to make before a judge than it may have been before a jury. A one-punch fight, so to speak. Correct. That's right. And those findings of fact were all sustained on the records. Even if the court were not to apply deference... Okay, go ahead. Even if we didn't apply deference, where would we be? Well, I think you have... Again, I'd come back to the factual findings of the trial court and... The PCRA court? The PCRA court. And I think what's fundamentally important here is that, again, this is not a case where Mr. Vickers expressly requested a jury trial and he was denied one by the trial counsel, advised him he was not eligible for a jury trial. What we're talking about here is, I guess, the viability of Commonwealth v. Mallory, which is what the PCRA court applied. Mallory, under Pennsylvania law, says, while an express waiver of a jury trial is certainly something that is preferred, it is not the end-all, be-all, let's say, that a court can come back after the fact, examine the totality of the circumstances, and determine whether or not there's been a valid waiver, meaning a knowing, intelligent, and voluntary waiver, even when no express waiver appears of record. That's the legal principle, the case that the PCRA court relied upon in denying Mr. Vickers relief. How does that fit into the analysis we need to undertake, assuming no deference, and that the district court needed to undertake, perhaps did, that is, a de novo Strickland review? Where does that fit into the analysis? Because the two prongs there, we need to consider whether the performance fell below the standard of reasonableness and prejudice. You're speaking to the merits of whether it's a knowing, involuntary waiver. Does that go to deficient performance? Does that go to prejudice? Yes, I believe it would go to deficient performance. The question would be, was Mr. Vickers' trial counsel, did he render deficient performance by not securing a written waiver of Mr. Vickers' right to a jury trial prior to proceeding to a non-jury trial? I mean, that really is the fundamental question regarding deficient performance. And are we going to say that it is consistent with prevailing professional norms that a defense counsel in a case doesn't check the file, the docket, with prior counsel, with no evidence that the client actually waived his right to a jury trial and proceeds with a bench trial? I think that certainly it would be a professional norm to make sure that your client has waived the right and done so knowingly and intelligently. Doesn't that answer the deficient performance prong? Well, I think it does and it doesn't in the sense that is it ineffective to explain to your client that he has this right to a jury trial, what the jury trial consists of, and yet failed to secure the written waiver. In other words, Mr. Vickers in the state court was determined to have known all of the things that the United States Constitution says that a criminal defendant should be made aware of prior to waiving his right to a jury trial. The state court found that to be a fact, that he was aware that he had the right to pick 12 people from the community with the assistance of his counsel and participate in the selection of that jury. He was made aware of all of that. He was made aware of the fact that he could do all of those things. In this particular case, his trial counsel testified. We talked about it. We talked about it even on the day of the trial, and I told him it's not too late to turn it back. But his counsel testified. He never told him that the verdict, if you went before a jury, had to be unanimous. Well, that's true, but the PCRA court was drawing its findings from two sources of information, one being the testimony of his trial counsel, who said we spoke in broad terms that you have the right to a jury trial in this case. It's a serious case, felony of the first degree. You have the right to a jury trial. You can turn back. And the other source of information would be a guilty plea colloquy, which was introduced into evidence from a prior conviction, a plea he entered in Allegheny County in 2004. And the PCRA court examined that document, found in 13 of the questions that it detailed all of the particulars surrounding his right to a jury trial. I just don't know what that gets you. The more I've thought about that, you're coming up with a new rule that if you have a prior offender, you don't need to have a jury trial waiver. And that's almost what this is here. Well, what this case would do, essentially, is to overturn Commonwealth v. Mallory and say that even if you examined all of the totality of the circumstances after the fact, and we're not talking about a case where someone's deprived of the right to a jury trial, one that they would be essentially to overturn Commonwealth v. Mallory and say that it is now a violation of the Sixth Amendment to look to the totality of the circumstances after the fact to find a valid waiver. That, again, it seems to me that the argument you're making goes to prejudice. If you agree that under prevailing professional norms, a defense counsel should recognize that there was not a full waiver, that the formalities of it and even the specific warnings that go along with it in the federal court that are required here by the state as well, that those weren't given, then we're looking at the question of was there prejudice. And before we look to specifics in the record, don't we need to define what the prejudice question is? Because we have Lilly on the one hand. Correct. And we have some arguably different indications from the U.S. Supreme Court when it comes to Flores-Ortega, Hill, even Lafler itself. So what do you believe the question is on prejudice, analyzing this not as a matter of state law, but federal ineffective assistance law? On the issue of prejudice, I would, of course, agree with the decision in Lilly that the question is not would Mr. Vickers have elected for a jury trial had he been made aware of that properly. The question is would the outcome of the proceeding have been different had the jury been the finder of fact as opposed to the judge. In Lilly, that's the test that this court adopted as being in alignment with Strickland, that being not whether or not Mr. Vickers had even explained his right to a jury trial elected that procedure, let's say. But would a jury have been, is there a reasonable probability that a jury would have arrived at a different conclusion than a judge would have, assuming that the judge was not biased, assuming that the judge followed the law, which I think is what the Lilly court says. How could we possibly determine that? Well, I understand that the Supreme Court has said that that's a difficult thing to do, to engage in what-ifs. But I think that the courts of law almost on a daily basis look at sufficiency of evidence on a regular basis. I realize that there is some benefit given when you're looking at sufficiency. But I think what you can do, what judges commonly do, is look at the evidence and say, is there really a question that a jury might have acquitted this man? Let's look at what the evidence was. Well, there wasn't much evidence here. Let's put it this way. I should restate that. It appears to me there was more evidence in Lilly than there was here. Well, the evidence that was presented in this case was described by the trial court as being clear, unequivocal, particularly the identification, especially when you consider the fact that Mr. Vickers never really carried on much further after his conviction about the identification, focusing more on the idea of whether or not one punch met the mens rea for the crime of aggravated assault in Pennsylvania. I'd like to get back to the right question, because Lilly was premised on the idea that if there was a fair trial, that there was no injury. And so if a judge is expected without other evidence to have given an unbiased, impartial trial, there's no reason to question the fairness of that, and therefore there's no injury. Loeffler comes along and says, that is not the right question. When we are looking at something like the denial of a right to a jury trial, when we are looking at a deprivation of a process right, not an error at trial, but an error in the processes that are even pretrial, that what we need to look at is whether there was a loss of the exercise of that right. And it harkens back to Hill and Flores-Ortega with very similar rights at issue. That is, in Hill, the waiver of a jury trial, Flores-Ortega, the loss of an appeal completely, and says, look, those are important rights, but we're not going to presume that there's prejudice from them. We're going to ask the question, would the defendant, is there evidence from the hearing, that the defendant otherwise would have exercised that right? If so, then a presumption of prejudice comes into play. So now that we have Loeffler that is undermining the premise of Lilly, I mean, really on all four is saying that is no longer a legitimate way to think about the nature of the injury in question, when you're talking about a process right. Why don't we have to ask the question that the Supreme Court is asking in Hill and Flores-Ortega? That is, you need causation. And so then the right question would be, on this record, is there evidence that he would have chosen a jury trial had he been given an appropriate waiver? Well, I think that that's certainly a valid question to ask in light of those cases. I think in the context of this case, you can look to the findings of fact of the state court, all of the ones about the strategy that Mr. Vickers went over with his counsel about the non-jury trial, when asking what he would have done. Again, the findings of fact of the state court were not that Mr. Vickers was unaware of these rights. The findings of fact of the state court were that Mr. Vickers was very aware of all of these rights. The real deficiency was he didn't sign the piece of paper acknowledging that he was aware of them. But the state court, the PCRA court, had no question, nor did the Pennsylvania Superior Court, have any question that Mr. Vickers was aware that he had these rights and he could exercise them if he so desired. And they found this fact, following a credibility determination, that he did not. You want to overlook the fact that he still asserts, or asserted, that he didn't know that he had the right to an unanimous jury. I think to credit that statement would be to overturn the factual findings of the state court, which were reviewed by the district court and the Pennsylvania Superior Court, and found to be sustainable from the record. Mr. Vickers said that, testified to that, to the PCRA proceeding. And his trial counsel said, to the contrary, that he was aware, that they did discuss it. You do have this colloquy that he signed, that he checked off every box, saying he was aware of all of those rights. But that was in the first case. That was five years before. Well, that's true, but fundamentally he was told in this case that he did have the right to a jury trial. Okay. So, if you're looking to answer the question, what would he have done, had he known, part of that question is, factually, it was found that he did know. All right, Mr. Muschietto, we're going to have you back on the bottom of the list. Yes, sir. Mr. Fine. Thank you. Mr. Muschietto, you may proceed on behalf of his amicus in this case, and you may proceed. Thank you, Your Honor. We're pleased to do so. And I am David Fine, and I appear as amicus curiae in this matter. And I'd like to focus first on the prejudice issue, because I think that the prejudice issue is probably the driver of this appeal, because I don't sense that the panel has much concern about whether this was, in fact, deficient performance. There are professional norms. They clearly were not met. Well, I wouldn't necessarily assume that. Go ahead. Well, Your Honor, is there a question that you have? I'd be pleased to respond. So, what exactly is it that makes this case difficult is the fact that we have replacement counsel. And presumably, the first counsel who agreed to a non-jury trial should have made sure that the form assigned and the colloquy occurred, right? Your Honor, I don't think the factual premise of your question is correct. And that is, there's no evidence about how this became a non-jury trial. There's no evidence that Mr. Jefferson Well, the first counsel knew it was non-jury. He knew it, but he never There's no evidence about whether he agreed to it. Okay, so successive counsel takes over the case, talks to her client who knows it's non-jury. She knows it's non-jury. And she presumes, we would guess, that everything had been done right. And so the deficient performance is not checking the record. Is that the deficient performance? The deficient performance is not checking the record to see whether there was a waiver and, in any event, not being sure that either Mr. Vickers was fully informed of his constitutional right and the counsel pursued that constitutional right, or that it was knowingly and voluntarily waived. Where we have, on the record here, it appears that Mr. Vickers had retained private counsel. The private counsel withdrew in December. And it wasn't until April, about two weeks before trial, that Mr. Vickers asked for appointment of public defender. With counsel coming in with two weeks to trial, is it really below professional norms for counsel to assume with a bench trial scheduled under those circumstances that there wasn't a knowingly and voluntarily waiver? Yes, it was. The answer to your question, Your Honor, is yes, it was below professional norms. In this circumstance, we know from the Patent Decision that the Supreme Court describes the right as one to be jealously preserved. All counsel had to do was take a look at the docket sheet or back into the file of the case to see whether, in fact, there had been a waiver. For that matter, all they had to do was say to Mr. Vickers, Mr. Vickers, did you, in fact, waive your right to a jury trial? Did Mr. Jeffries, your former counsel, tell you that? I think he did do that. No, he didn't. I think that conversation was had and he was told, I don't want a jury trial. Your Honor, the conversation that was had was more a strategic conversation. It was an informative conversation. This was Mr. Cook who testified during the PCRA hearing, that second lawyer, testifying that, in fact, he said, well, you know, I think for this case, you'd probably be better off with a judge because you have sort of a narrow legal issue. And he got no pushback. And he got no pushback. But, of course, for the non-pushback, for the acquiescence to be meaningful, it had to be knowing. And there's simply no evidence in this record that anyone informed Mr. Vickers of all of the protections afforded to him by the Sixth Amendment and by that right to a jury trial. So if you have deficiency, why doesn't what you were just talking about answer the prejudice question? That is, if he made a strategic decision with counsel and we have testimony, we have credibility findings in the record, if the test is not the Lilly test, but it is the test that we can take from Lafler, Hill, Flores, Ortega, where is there any evidence that he otherwise would have chosen a jury trial? There are in a number of places. First, he testified at the PCRA hearing that he would have taken a jury trial had he been fully informed. So that's in the record. Now, I recognize that the PCRA court did not find that credible. But, nonetheless, you asked if there was evidence in the record. There was evidence in the record. Moreover, any discussion that he might have had with counsel about strategy doesn't matter if he wasn't fully informed because he can't acquiesce in giving up a constitutional right if he doesn't know all of what that right's about. Now, Mr. Muschietto, when he was at the lectern, said that, no, in fact, he was fully informed of all of these things. But, Judge Fischer, as you pointed out, there is no evidence, even giving all credibility determinations to the PCRA court, there is no evidence that he was informed that a jury would have had to have been unanimous. That's why we picked that out in our brief, to point to, because we didn't want to get into questions about AEDPA factual deference. All right. So let's take you to the second point, which you were trying to start on, the question of prejudice. Is it properly before us? Well, Your Honor, as we noted in our brief, the Commonwealth is the appellate here, and that's not a usual situation for me in these pro bono cases. But as the appellate, the Commonwealth had the obligation to come forward and to say that both of the findings of the trial court, of the district court, were wrong. It did not do that. It did what the district court did. Well, let me back up. It did what the PCRA court did and what the Pennsylvania Superior Court did, which was to focus on the first prong of Strickland, that deficient performance piece. But, of course, the Commonwealth never discussed in its opening brief in this court that issue of prejudice. So I think that there is, in fact, a good argument that it has been waived. We don't predicate our entire argument on that. I recognize that waiver is nothing but court's leapfrog. Let's assume it's in front of us. Assume it's in front of us. And we know that what is in front of us is a decision in Lilly. Actually, an opinion or a case that I sat on the panel almost ten years ago, I think. I saw that. How do you distinguish this case from Lilly? How do you get around Lilly? Your Honor, you won't be surprised to hear that I thought I might get asked that question. I'm surprised, yes. And I think the answer is this. Lilly was a case in which the arguments—and I actually went back and looked at the briefs. Lilly was a case in which the two sides were arguing competing definitions of prejudice, as Judge Krause was talking about earlier, whether it should be Hill or whether it should be the definition of prejudice that Judge Ambrose ultimately drew in majority opinion. What that court never considered was whether, in fact, prejudice, in the sense of actual prejudice, needed to be proven. It was deciding between two possibilities that were presented to the court. As we argue in our brief, we think that there's a very solid argument that this is structural error. And because it's structural error, we can deem prejudice to have been proven. We can presume prejudice. We've never said that. Well, a third of you sort of has, because we're going to blame Judge Malloy in the Eighth Circuit. No, no, no. But he said in the Eighth Circuit it doesn't count. Even if it was brilliant? Well, we might listen to it. That's a pretty adepa case, pretty old. Well, it is, but the point it makes, Your Honor, I don't think falls by the wayside simply because of ADPA. Moreover, I should note, and we did note this in our brief, that there's now a cert petition before the Supreme Court that would actually address that very issue. Weaver against Massachusetts. And I think the Court's going to be hearing it in conference this month. And there are circuits on different sides of this question. There are. And why should we presume prejudice in a case like this? Well, because structural error, by definition, is one that the Supreme Court has described, in Felinanti and other cases, as being indeterminate. In other words, it's unmeasurable, the harm that's caused. That's why we can't engage in a harmless error analysis. But nonetheless, we recognize that the right is so fundamentally important that we're not going to make it essentially unenforceable simply because it's indeterminate. Some rights are just so important. Now, how is this a structural error? Well, first of all, we have the McGurk case from the Eighth Circuit, which I think makes a very potent argument, without attempting to kiss up to any members of the panel who might ordinarily sit on the Eighth Circuit. But we know that a structural error is one that goes to the whole structure of the case. It's not a discrete trial problem. We're not dealing with a claim of error in the deprivation of a jury trial, per se. Even if we were, we're not dealing with the McGurk situation of a trial right not being recognized, there being no trial offer discussed. We're dealing with a Sixth Amendment ineffective assistance claim. And the Supreme Court has only recognized structural error as to ineffective assistance in three specific circumstances. And the total deprivation of counsel is the only one that could apply here. That's what the court has said is required. And it's gone as far in Flores-Ortega, it seems to me, as saying, even if you're claiming something so fundamental as the trial counsel's failure to file notice of appeal, you've lost your appeal right. You can't look at this as the total deprivation of counseling. You still have to look at that as a discrete error and engage in a prejudice analysis. Why isn't that akin to what we have here? Why doesn't that answer, along with Hill, which is even closer in terms of facts? Well, I understand the point you're raising. And, no, I'm not suggesting that this is a chronic situation, if you will, that it's a total deprivation of counsel. But let's look at the sorts of cases that the Supreme Court has pointed to as structural error cases. For example, not having a public trial. In fact, that's the Weaver case that's now up before the courts. Can you focus us on ineffective assistance structural error? I understand, Your Honor, and I'll get to that, I promise. My point, though, is that the courts that have recognized presumed prejudice, including, I believe, McGurk, as you read it, and other courts, the First Circuit and others, have said that ineffective assistance of counsel that results in a structural error, in other words, the ineffective assistance is not itself the structural error, but the ineffective assistance that results in a structural error is presumed to be prejudicial, then, because of the effect of it. The effect is to cause a structural error in the case. How else could you ever remedy that? How do you reconcile that with Hill or Flores-Rotiga? Your Honor, I don't directly know the answer to your question, but I know what the courts have said about structural error. And what they've said is that it can supply prejudice for purposes of Strickland. And I think that that is a way, to turn back to Judge Fisher's question, I think that that is a way to get around Lilly. Because I don't think Lilly said it wasn't structural error, it just didn't address it. How do we get around what we said in Palmer v. Hendricks? In what sense, Your Honor? Well, in Palmer v. Hendricks, we said that it was not structural error. In Palmer v. Hendricks, that was a case in which Palmer was alleging that his counsel instructed him not to testify. Right. And not testifying was not a structural error. And not testifying wasn't a structural error. I think it was Judge Fuentes, I think, who wrote the opinion there. And it wasn't a structural error. So it doesn't get into the analysis that I've suggested to Judge Kress. Isn't that the same kind of speculation-type case that you're referring to in comparing what would have happened before a jury as opposed to what happened before a judge? I don't think so, Your Honor. Because look, again, at the sorts of cases in which courts have found structural error. And the one that I think is a very good and very similar one is not having a public trial. And there are cases where courts have very clearly said that's a structural error. To me, that's closer than the circumstance that we have in this case, which is you didn't get a jury. Can we ever tell what the difference is? You asked my opponent, how would we ever know what the difference would have been had he gotten a jury trial? And that's a very good question. And the answer to that question is we can't. It's indeterminate. That's why we call that structural error. Now, in Palmer, what we dealt with was he wasn't informed of his right to testify or not to testify. No court has ever held that that was a structural error. And that's very different from the other sorts of things that have been held to be structural errors. Let's say we agree with you as to the total deprivation of a jury trial. Sullivan says that quite clearly. You cannot go ahead and speculate when someone was denied the right to a jury trial what the jury would have done. But, again, we're dealing with an ineffective assistance claim, and the issue is not the right to the jury trial per se. It's whether the waiver was sufficient, was knowing and voluntary. The Supreme Court's already addressed that in Hill and has proceeded to address it not as a matter of structural error with presumed prejudice, but as a standard, stricter approach, looking at prejudice and asking the question whether there's evidence that the defendant otherwise would have chosen to proceed by way of jury trial. Why doesn't that tell us exactly what we need or the district court needed to do here? Your Honor, I have two answers to your question. The first is, if you believe that Hill, in fact, controls in the way that you've described, we do have evidence in this record that would support the proposition that he would, in fact, have opted for a jury trial. But before we get to that, I would remind the court again that you're absolutely right. This isn't an effective assistance question, and that's the prism through which we look at this. But we've already discussed whether this was, in fact, deficient performance, and I think that there's a very strong case that the state courts unreasonably applied federal law, the first prong of Strickland, in saying that this was not deficient performance. With respect to prejudice, as I've said, prejudice can be supplied by presumed prejudice because it's a structural error. That's how we get to it. And I understand what you're saying, Your Honor. It's not a direct deprivation of a jury trial claim. It's one step removed. But the only step that's removed is prejudice. What did the – we can read it ourselves, but it just seems to me the district court said there was deficient performance, therefore there was prejudice. Good night. Rick Granat. What should district courts do in cases like this? Are you asking me to offer a critique? Yeah, I mean, I doubt that maybe the district court did enough. If it's structural error, maybe that was – maybe it was enough, but it caught me like, well, I'm not sure they really analyzed prejudice here. It was a trifle perfunctory. Having said that, let me say that. I like that word, trifle. If you put it in any opinions, please do not attribute it to me because the district judge may, in fact, read it. Your Honor, my point is this. I think it was probably a somewhat cursory analysis, which is to say it was no analysis. But it got to the right point. And, of course, this court can affirm on any basis presented in the record, whether it's that it should be a Hill analysis and there was at least evidence to support a Hill analysis, whether it's that the Commonwealth somehow waived. I want to ask you one last question here. I'm not sure you answered my Lilly question, even though you told me you were prepared for it. You talked about the Hill line of cases and the presumption line of cases. How do we get around Lilly? Your Honor, Lilly decided what was placed in front of the panel. It said it's between two iterations of prejudice. Hill, or what Judge Amber ultimately opted for, there would have been a different result. This was the one the panel chose. Nobody argued to that panel either that there was structural error or that there could have been some other possible argument of the sort, for instance, that Judge Krauss has offered. So you're saying that was not a structural error case? It was not. The court did not reject a structural error argument. It wasn't presented to it. So for this court to say it was structural error would not get it sideways with the Lilly panel. And I would say I think that's the correct answer. But if it were not the correct answer, we'll have the opportunity to take something en banc and decide that question, because I think it is structural error. Do we need to take it en banc with Lafler in the picture? I don't think so, Your Honor.  Coming after Lilly as it did and indicating that we can't look to the fairness of the trial, the bench trial. We have to look to a causation piece first. Your Honor, I agree with what you've said, and I think that that would also be a very good way of answering. I will adopt by reference what you said in answer as well to Judge Fisher's question. Yes, I think Lafler would, in fact, allow another way to say that Lilly is no longer good law, based on those points. Okay. All right. Thank you, Mr. Fine. Pleasure, Your Honor. Mr. Moschetta, now we raised, Mr. Moschetta, or Mr. Fine raised the structural error question. I was going to ask you that, but I assumed it was going to be raised by the Appellee. Do you want to respond? Why isn't this structural error? I think it's, I don't want to say, a difficult proposition in this case, given the factual background that the findings of fact that the state court, the PCRA court, found in this case. It is not like McGurk, where the attorney actively deprives his client of the right to a jury trial through some drastic omission, like telling him you don't have the right to a jury trial. And by that direct action, he caused his client to lose a fundamental constitutional right. There's a clear correlation between his counsel's omission and the deprivation of the right. In this case, the findings of fact do not support that logic. The findings of fact are that counsel made his client aware that he had the right and that client was aware of that right. The only evidence in the record that Mr. Vickers was not aware and would have chosen a jury trial was his testimony, which ultimately was not credited by the PCRA court. It was found to be not credible testimony. The PCRA court credited his trial counsel's testimony, saying that he was aware of it and he did select it for a strategic reason. So in that sense, I can understand where if trial counsel's ineffectiveness, there's a causal connection between the omission and the total deprivation of the right, then I think it's logical to say that that's a structural error. But here you have a bridge, I think, or a break in the bridge, in the causal connection between counsel's alleged deficient performance and the total deprivation of the right. When the district attorney's office didn't raise prejudice, didn't address structural error, and didn't even file a reply brief when those issues were raised until it was instructed to do so, why shouldn't we find that those arguments in response to prejudice are simply waived? Well, that was regrettable, I will admit. I would say that no court that's looked at this case has given an in-depth analysis to the issue of prejudice, that the focus, including at the district court level, was on, I think, what we would call the first problem, the deficient performance analysis. And so I would say that the matter only really came up with the brief of amicus counsel, and that when ordered to, we did respond. I did cite cases in my reply brief that said when a substantial public interest is involved, then this court can exercise some discretion and excuse the waiver. I would say that there is a substantial public interest involved here, one, because we're talking about the parameters of the Sixth Amendment, but also, and this is my opinion, I think Commondole v. Mallory stands in some jeopardy as good law in Pennsylvania if the district court order is permitted to stand in this case, that this is ineffective assistance of counsel, that courts cannot, under these circumstances, look post hoc, let's say, and justify whether there's a waiver. Given that there are substantial public interests involved here and responsibility on the part of the prosecutor's office to represent those public interests, don't we need to be concerned here that we have, throughout the federal proceedings, repeated needs for orders to show cause and failure to respond to the district court's orders, failure to address before us arguably controlling the Supreme Court and Third Circuit case law, failure to file a reply brief when the respondent's brief has raised such fundamental issues of structural error, and even looking back, and I realize you were not counsel throughout all the proceedings, but even in the PCRA court, failure to file responsive briefs. You seem to recognize the substantial public interest at stake. Why aren't we seeing more diligent and responsible actions in its litigation by the district attorney's office? Well, saying that, I don't want to, I guess, confuse an explanation with an excuse. And there's no excuse for prior failures to file. I said that to the district court, and I'm not going to give this court an excuse. There is no good excuse. All I would offer to you is that, and this sounds like an excuse, that the burdens, let's say, of the day-to-day events on a small district attorney's office oftentimes makes filing, I don't want to say difficult, but reply briefs and things of that nature. We did file in order to do so. And I'm not going to make any excuse for any prior. Mr. Machado, let me follow up on that question. Look, I think that from your performance here this afternoon and from what you filed, you've done a good job for the office and for the taxpayers of Washington County. Thank you, sir. And that's not what my question is directed towards. But in this case, as we look at this case as a whole, there were a number of omissions. Yes. Including not responding to the amicus brief until directed to. I wonder if habeas practice in an office like yours continues to be a stepchild of the office. I guess in my experience it is. Do you get many habeas petitions? Well, I'm the appeal unit, the habeas unit. So how many habeas petitions do you get in the course of a year? Ten. Ten. Do you know whether or not, and you probably should know this, I had the same question raised to me about 20 years ago when I was the state's attorney general by the chief judge of this court who called and told me that I should be taking over all the habeas practice in the state. And I told him I didn't think that was very practical and probably wouldn't fly, but I would see if we could structure something. The attorney general's office at that time then created a capital habeas unit to help local counties like yours. Do you know if that unit is still in existence? I think it is. When a federal habeas gets filed, I customarily get a letter from the attorney general's office saying that we, as the prosecutor's office, are in a better position to handle the litigation. That's the letter. Because the named respondent is always the warden of the state correctional institution. Yes, sir. But have you reached out to that office for help and assistance? On occasion I can say we have, yes. Okay. All right. Yes, sir. Well, I think that's enough of that topic. I was curious about it, and Judge Cross had a concern about the number of omissions in this case. But we raised that. We got your answers. And I would just suggest to you that in the future you pay equal, give equal attention to these matters regardless of where they come from. Yes, sir. With that, we'll take the matter under. We thank counsel for their job today.